<pre>
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2

 3    *  *  *  *  *  *  *  *  *  *  *  *  *  *
      *UNITED STATES OF AMERICA    *
 4                                 *    CRIMINAL ACTION
               v.                  *    No. 09-10332-RGS
 5    *                            *
      DAVID LAPERLE                *
 6                                 *
      *  *  *  *  *  *  *  *  *  *  *  *  *  *
 7

 8

 9

10           BEFORE THE HONORABLE RICHARD G. STEARNS
                  UNITED STATES DISTRICT JUDGE
11                        PLEA HEARING
                      February 17, 2011
12

13    APPEARANCES:

14            UNITED STATES ATTORNEY'S OFFICE, (By AUSA Kenneth
      Shine), 1 Courthouse Way, Suite 9000, Boston,
15    Massachusetts  02210, on behalf of the United States of
      America
16
              OFFICE OF THE FEDERAL PUBLIC DEFENDER, (By Syrie
17    Fried, Esq.) 55 Sleeper Street, Boston, Massachusetts
      02210, on behalf of Defendant
18

19

20                                  Courtroom No. 21
21                                  1 Courthouse Way
                                    Boston, Massachusetts 02109
22

23               James P. Gibbons, RPR, RMR
                    Official Court Reporter
24               1 Courthouse Way, Suite 7205
                 Boston, Massachusetts  02210
25                  jmsgibbons@yahoo.com
</pre>

```
1                     P R O C E E D I N G S
2            THE CLERK:  All rise for the Honorable Court.
3        Court is open.  You may be seated.
4        The case before this Court carries Case No. 09cr10332,
5   United States of America versus David Laperle.
6        Counsel, please identify yourselves for the record.
7            MR. SHINE:  Your Honor, good morning.  Kenneth
8   Shine on behalf of the United States Government.
9            MS. FRIED:  Good morning, your Honor.  Syrie Fried
10  on behalf of David Laperle, who is present in court.
11           THE COURT:  Ms. Fried, I understand that your
12  client is offering to change his plea to a one-count bank
13  robbery indictment, that there is no written, but perhaps
14  there is an informal, agreement.
15           MS. FRIED:  There is no written plea agreement, and
16  there is one subject area on which there is an informal
17  understanding between the parties, which I will tell the
18  Court about.
19       The offense conduct in the indictment is January 9,
20  2009.
21       Mr. Laperle was arrested by state authorities for
22  offenses that he is now serving a sentence on.  He was
23  arrested one week later on January 16, 2009, and was
24  sentenced.  And those were for, essentially -- I think it
25  was receiving a stolen motor vehicle and unauthorized use,
```

1    but it was what I would call relevant conduct as to this

2    offense because the evidence that would have been admitted

3    in court, had this case gone to trial, was recovered as a

4    result of the incident that lead to his arrest on these

5    state court motor vehicle charges.

6         And, in fact, there was a theft of currency charge that

7    had been originally brought on the state side but which was

8    dropped in favor of this bank robbery prosecution.  But

9    robbery proceeds were found in the car, et cetera, et

10   cetera.

11        But, to sort of try to cut to the chase a little bit,

12   he's been doing a state court sentence on that and has about

13   two years' -- a little bit more that two years' time in on

14   that case, which, under federal law, cannot be credited

15   toward any sentence that this Court would impose in this

16   case under 3585; 18, United States Code, Section 3585.

17        So the understanding between the parties is that we

18   would urge the Court that it would be appropriate for a

19   downward adjustment to whatever sentence the Court decides

20   to impose on this robbery, but that would be sort of what

21   would amount to a 5G1.3 type of downward adjustment to take

22   into account the fact that he's doing an undischarged term

23   of the imprisonment for conduct that the Federal Bureau of

24   Prisons would not give him jail credit for on this case but

25   which is related to this offense conduct.

```
 1              THE COURT:  So a downward adjustment to reflect
 2     credit for the state time he is serving as opposed --
 3              MS. FRIED:  Right, which, as of today, is
 4     approximately two years.
 5              THE COURT:  Okay.
 6              MS. FRIED:  But that's approximate.
 7              THE COURT:  Okay.
 8         Let's -- that's agreeable.
 9              MS. FRIED:  With that, my client is ready to be
10     inquired of.
11              THE CLERK:  Mr. Laperle.
12         Count One of the indictment filed by the United States
13     attorney charges you with bank robbery, in violation of
14     Title 18, United States Code, Section 2113(a), and aiding
15     and abetting, in violation of 18, United States Code,
16     Section 2, to which count you have previously pled "not
17     guilty."
18         Do you now wish to change your plea?
19              THE DEFENDANT:  Yes, I do.
20              THE COURT:  How do you plead to Count One?
21              THE DEFENDANT:  I plead guilty.
22              THE COURT:  Please raise your right hand.
23              **DAVID ALAN LAPERLE, sworn**
24              THE CLERK:  Would you please take a seat in the
25     witness box.
```

1    Counsel, would you join him.

2    (Pause in proceedings.)

3    THE COURT:  Mr. Laperle, my name is Richard

4    Stearns.  As is self-evident, I am a Judge of the United

5    States District Court.

6    I am going to ask you some questions, and the reason

7    for the questions is that I am required to make my own

8    determination that your decision to plead guilty is a

9    voluntary decision, and one made with full knowledge of the

10   consequences of pleading guilty.

11   So if any question I ask seems confusing or imprecise,

12   either ask me to rephrase it, or feel free to consult with

13   Ms. Fried before you answer, okay?

14   THE DEFENDANT:  Yes, your Honor.

15   THE COURT:  For the record, can you tell us your

16   full name.

17   THE DEFENDANT:  David Alan Laperle.

18   THE COURT:  How old are you, Mr. Laperle?

19   THE DEFENDANT:  I'm 54 years old.

20   THE COURT:  Fifty-four?

21   Were you born in Massachusetts?

22   THE DEFENDANT:  Yes, sir, I was.

23   THE COURT:  Where?

24   THE DEFENDANT:  I was born at St. Elizabeth's

25   Hospital in Brighton.

```
1              THE COURT:  Did your family stay in Brighton, or
2    where you did you grow up?
3              THE DEFENDANT:  I believe at the time my family was
4    living in Newton, Mass., your Honor.
5              THE COURT:  And then where did you go to school?
6              THE DEFENDANT:  I grew up and went to school in
7    Ashland, Massachusetts.
8              THE COURT:  Ashland?
9         How far did you go in school?
10             THE DEFENDANT:  I did not graduate high school, but
11   I did receive a GED later in life.
12             THE COURT:  What grade did you leave school?
13             THE DEFENDANT:  I never completed the 9th grade.
14             THE COURT:  Never completed the 9th?
15        Did you work after?
16             THE DEFENDANT:  I did, yes, sir.
17             THE COURT:  What kinds of work have you done?
18             THE DEFENDANT:  Mostly landscaping, jobs in
19   irrigation installation, your Honor.
20             THE COURT:  Where are you living now?  I mean
21   before the incarceration.
22             THE DEFENDANT:  Before the incarceration I was
23   living in Boston.
24             THE COURT:  In Boston?
25             THE DEFENDANT:  Yes.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  Are you married?
2              THE DEFENDANT:  I'm divorced, your Honor.
3              THE COURT:  Children?
4              THE DEFENDANT:  I have two grown children, yes,
5         sir.
6              THE COURT:  They're adults?
7              THE DEFENDANT:  Yes, they are.
8              THE COURT:  Are they living in Massachusetts?
9              THE DEFENDANT:  They both live in Massachusetts,
10        your Honor.
11             THE COURT:  How old are they?
12             THE DEFENDANT:  My oldest daughter is 30, and my
13        younger girl is 23.
14             THE COURT:  So probably grandchildren?
15             THE DEFENDANT:  I also have two young grandsons,
16        your Honor.
17             THE COURT:  This question I don't mean to be
18        intrusive.  I'm required to ask it.
19           Have you ever been treated for any mental condition or
20        psychological problem?
21             THE DEFENDANT:  I have had counseling for
22        depression, your Honor.
23             THE COURT:  Are you taking any medication or
24        prescription drugs?
25             THE DEFENDANT:  No, I am not.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1              THE COURT:  When was the most recent --
2         Again, I don't want to pry too much, but was this in
3    the past, or is this something recent?
4              THE DEFENDANT:  It's not ongoing, I wouldn't say,
5    at this time.
6              THE COURT:  So as far as you're concerned as you
7    sit here, your mind is clear and you understand the nature
8    of the proceedings.
9              THE DEFENDANT:  Yes, your Honor.
10             THE COURT:  Did you do military service, by the
11   way?
12             THE DEFENDANT:  Yes, your Honor.  I was in the
13   Army.
14             THE COURT:  For how long?
15             THE DEFENDANT:  Approximately two years.
16             THE COURT:  Honorably discharged?
17             THE DEFENDANT:  General discharge.
18             THE COURT:  I know she has, because she is very
19   thorough; but, for the record, I have to ask.  Has Ms. Fried
20   discussed the indictment with you, the charging document?
21             THE DEFENDANT:  Yes, your Honor.
22             THE COURT:  Perhaps more importantly, has she
23   explained to you each of the elements of this offense?  By
24   "elements" a lawyer means the components of the offense
25   charged that the government would have to prove beyond a
```

1       reasonable doubt to obtain a conviction.

2               THE DEFENDANT:  Yes, your Honor.

3               THE COURT:  Okay.

4           I mean, it's pretty straightforward, so I will be very

5       brief.

6               "Bank robbery," we know what that is.

7           This alleges that on January 9, obviously the bank was

8       in Cambridge, it was insured by the Federal Deposit

9       Insurance Company.  The government has to prove that to have

10      jurisdiction over what otherwise would be a state crime.

11          And it basically charges that you took, and this is the

12      way the law is phrased, "by force and violence and by

13      intimidation," that means by offer of harm to someone, you

14      took money that was otherwise under their possession and

15      control, and it specifies that the amount here is slightly

16      under $15,000.

17          You understand that each of those things the government

18      would have to prove beyond a reasonable doubt?

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  Federal insurance, offer of harm or

21      actual physical contact with someone who actually had

22      custody of the money and who turned the money over,

23      transferred it to your possession, as a result.

24          That's all clear?

25              THE DEFENDANT:  Yes, sir.

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  Let's establish, Mr. Shine, for the

2      record what the maximum statutory penalties are for the

3      offense.

4           MR. SHINE:  The maximum statutory penalties for

5      this violation is 20 years in prison, followed by three

6      years of supervised release, a fine of $250,000, and a

7      mandatory $100 special assessment.

8         There are no minimum mandatories that apply.

9           THE COURT:  Mr. Laperle, you understand that these

10     are the statutory maximums.  In other words, if you went to

11     the statute books, this would be the maximum sentence that

12     Congress has authorized a judge to impose.

13          THE DEFENDANT:  Yes.  I understood that.

14          THE COURT:  More relevant, I suppose, are the

15     Sentencing Guidelines.

16        Do you have a working estimate of how they apply?

17          MR. SHINE:  There are two schools of thought.  I

18     will be very fair to Mr. Laperle.  There was a pre-plea PSR

19     done.  Under the pre-plea PSR, Mr. Laperle would be

20     classified as a career offender and, therefore, would be in

21     a Guideline range as a career offender of 151 to 188 months.

22        The second view, which is not the government's

23     position, if he were not to be a career offender, the

24     Guideline range could be 70 to 87 months, or in that kind of

25     range.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              THE COURT:  By career offender, we're talking about
 2     the Guideline provision, not the armed career --
 3              MR. SHINE:  That's correct, your Honor, the
 4     Guideline provision of the career offender, having
 5     established at least two prior felonies, or crimes of
 6     violence, within a delineated statutory period.
 7              THE COURT:  So under the first theory, where is the
 8     criminal history category?
 9              MR. SHINE:  The criminal history category would
10     commence at 32, with three points for acceptance of
11     responsibility, to a 29.
12         I'm sorry.
13         The base level would be 32, with three points to 29.
14         The Criminal History Category would at VI under the
15     Career Offender Guidelines.
16              THE COURT:  Under the second view?
17              MR. SHINE:  Under the second view, the defendant's
18     base level would be twenty --
19              MS. FRIED:  I think it's 22.
20              MR. SHINE:  Twenty-two, with acceptance of
21     responsibility, and his Criminal History Category is 14,
22     which would be six points.
23              MS. FRIED:  Your Honor, there was a pre-plea
24     sentence report done in the case.
25              THE COURT:  For some reason I don't recall it.
```

1          MS. FRIED:  It was done a while back.  But, in

2     light of Holloway, that throws into doubt one of the

3     predicates.

4          THE COURT:  This is the stepping back from the

5     categorical --

6          MS. FRIED:  That's right, with the assault and

7     battery.  There are a number of assault and battery

8     convictions, or AB-PO, AB-DW, which is all thrown into

9     question now.  In fact, the First Circuit has in front of it

10    a case that's precisely on question.

11         THE COURT:  Actually, it's one of my cases which

12    predated Holloway.

13         MS. FRIED:  Dancy.

14         THE COURT:  The Dancy case.

15       I think they argued --

16         MS. FRIED:  It just was argued a week and a half

17    ago.

18         THE COURT:  So by the time of sentencing here, we

19    will have the answer.

20         MS. FRIED:  We probably will have an answer on

21    that.

22         MR. SHINE:  Just for the record, the predicate in

23    question is an AB-DW.  The government's view was that

24    Holloway did not address the AB-DW.  It primarily only

25    addressed the assault and battery.  And it's the

1    government's view that the AB-DW does count as a predicate

2    in that regard.

3            THE COURT:   I will see the Dancy opinion and then

4    resolve this.

5            MR. SHINE:   Absolutely, Judge.

6            THE COURT:   I hope this is not too confusing,

7    Mr. Laperle, but let me try to untangle this web.

8        The Sentencing Guidelines are this thick book of

9    directives (indicating) that an agency created by Congress

10   has generated over the years that came into existence in the

11   1980s when Congress became concerned about what appeared to

12   be large discrepancies and disparities in the sentencing

13   practices among federal judges.   Some judges were sentencing

14   very severely; others very leniently, for what seemed to be

15   similar defendants who had committed largely similar crimes.

16       And the more Congress studied the issue, the more

17   disturbed they got because it seemed there were extraneous

18   factors that were the only way you could explain why these

19   disparities existed.

20       Geography mattered a lot.   Depending on what part of

21   the country the crime was committed, you could get a much

22   different sentence than another part of the country.   Gender

23   mattered a great deal.   Embarrassingly enough, factors like

24   ethnicity and race seemed to be influencing sentencing

25   decisions.

PDF created with pdfFactory trial version www.pdffactory.com

1    I think probably more revealing, when all the studies

2    were done, is that a lot of sentencing seemed to be really

3    the personal philosophy that the judge in question brought

4    to sentencing issues.

5    Congress wanted more uniformity.  To do that, they

6    created a Commission called the "United States Sentencing

7    Commission," and told them to go out and figure out how to

8    accomplish this goal.

9    The Commission did some very serious work but came up

10   with a very simple solution, which was, we can make this

11   work by simply taking away most of the discretion judges

12   have in sentencing matters; not all, but a lot.

13   So they created this Guidelines system, and this is

14   what Mr. Shine was referring to when these numbers started

15   to be thrown around.

16   The numbers are important because they're called an

17   "offense level."  There are all kinds of factors that go

18   into calculating the offense level:  The crime itself,

19   whether, as you're doing, someone has accepted

20   responsibility which causes a downward adjustment in the

21   level, the prior criminal history which determines the

22   criminal history category.  There is a provision, which is

23   obviously going to be argued, called the "career criminal"

24   provision, which escalates the criminal history category up,

25   and, therefore, impacts the Guidelines.

1    But the underlying idea, even though its application is

2  not always easy, is simple.  The Commission went through the

3  Federal Criminal Code and ranked offenses by perceived level

4  of seriousness from the least to, what they thought were,

5  the most serious offenses on a scale of one to forty-three.

6  That's the offense level.

7    That level, once it's adjusted and then calculated and

8  the criminal history category is factored in, is important

9  because it is keyed to a range of months, expressed as a

10 minimum and a maximum.  And typically the judge, the way the

11 system was originally conceived, was expected to sentence

12 within that range with some exceptions.  The judge has a

13 fair amount of authority to engage in what were called

14 "departures," to go up above or down below.

15    Over time, though, as Courts of Appeals began to

16 analyze the Guidelines, they began to take on more and more

17 of a mandatory aspect until we got to a point five years ago

18 where there was almost no discretion left for judges in the

19 Guideline system.

20    Now, the Supreme Court got alarmed because they thought

21 that that was not consistent with the constitutional

22 function of a judge; that a judge is supposed to be bringing

23 judgment, as the name would imply, to sentencing, and is

24 supposed to be ensuring that the sentence imposed is a just

25 one, that is, that it fits the circumstances of the

1    defendant and the crime and then the various societal

2    interests that are at play.  Obviously society has a

3    interest in deterring people generally, sometimes deterring

4    people specifically.  Society has an interest, as does a

5    defendant, in the opportunity for rehabilitation, you know,

6    for consideration of past good deeds, prospect for future

7    good deeds, or bad deeds, as the case might be.  All the

8    kinds of things that would occur to anyone ought to enter

9    into the judgment.

10        So the Court said, Look, we recognize that the

11   Guidelines have distilled a lot of experience and wisdom,

12   but we want judges to do the following:  Look first to the

13   Guidelines.  Look at the recommended result.  If it's a

14   reasonable one, impose the sentence accordingly.  If it

15   doesn't fit the crime or the defendant, use your judgment,

16   use your discretion.

17        So, in other words, judges were handed back a great

18   deal of the discretion they had before the system became a

19   largely mandatory one.

20        This is a long way of getting to the fact that, at the

21   end of the day, I have to make the ultimate judgment about

22   the sentence.

23        There may be disagreement -- in fact, it sounds like

24   there will be between your counsel and the government.

25        There is agreement between counsel, which, I will tell

PDF created with pdfFactory trial version www.pdffactory.com

1    you now, I will respect, which is to at least adjust the

2    sentence to reflect credit for the state time that you are

3    serving.  But, after that, with the help of the lawyers and

4    their arguments, I have got to make the final decision, and

5    simple displeasure with how I go about doing my job is not a

6    basis for withdrawing a plea.

7         Do you understand that?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Do you have any questions about the

10   sentencing system?  It's a little bit more complicated

11   than -- I was a State Court Judge, and it was not quite as

12   formal there as it is here.  So if there is anything that --

13             THE DEFENDANT:  No.  That was a very good

14   explanation.  I think I understand, yes.

15             THE COURT:  You do understand that by pleading

16   guilty you give up your right to have your case tried before

17   a jury?

18             THE DEFENDANT:  Yes.  Yes, I do, yes.

19             THE COURT:  Have you any prior experience with

20   juries?

21             THE DEFENDANT:  No, your Honor.

22             THE COURT:  Never seen a jury trial, served as a

23   juror --

24             THE DEFENDANT:  No, I have not.

25             THE COURT:  -- had one of your cases tried before a

1    jury?

2             THE DEFENDANT:  No, your Honor.

3             THE COURT:  Under the U.S. Constitution, judges are

4    given a great deal of authority over matters of law, but if

5    the defendant or the government insists on it, in any

6    important or serious criminal case, that is, in any felony

7    case, the decision as to whether someone is "guilty" or "not

8    guilty" is made not by the judge but by a citizen jury.

9         There's a panel of 12 persons chosen from, in our case,

10   eastern Massachusetts randomly by computer who are summonsed

11   to court on the day of the trial.  They're interviewed then,

12   mostly by the judge but with the lawyers helping, to

13   determine their eligibility to sit on the case that is to be

14   tried.  As the jury is being seated, a defendant can object

15   to the seating of any ten jurors that, for whatever reason,

16   he does not want to sit on his trial, as the government can

17   object to any six.

18        Once seated, I explain to the jurors that they will

19   listen to the evidence and, at the end of the day, will have

20   to be unanimous; that is, they all must agree as to whether

21   a defendant is guilty or not guilty of the offense being

22   tried.

23        So when I say that you give up your right to have your

24   case tried before a jury, I mean not only the right to have

25   a jury decide whether you are guilty or not guilty of this

1    offense, but also the right to participate in the selection

2    of the very jury that would make that decision.

3         Do you understand that?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Do you understand that you would have

6    the right to have Ms. Fried, a very capable lawyer, assist

7    you throughout the jury selection process and throughout the

8    trial of the case?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Do you understand that I would instruct

11   the jury that they must presume you innocent unless and

12   until the government succeeded in proving your guilt beyond

13   a reasonable doubt?

14             THE DEFENDANT:  Yes, I do.

15             THE COURT:  Do you understand that the burden of

16   proof in a criminal trial, one that the government carries

17   throughout the trial, is "proof beyond a reasonable doubt,"

18   a very, very high standard of proof?

19             THE DEFENDANT:  Yes, I understand.

20             THE COURT:  The practical consequence of that means

21   that you would have no obligation to prove your innocence,

22   to produce evidence, to call witnesses, nor certainly could

23   you ever be compelled to testify at the trial.

24        Do you understand that?

25             THE DEFENDANT:  Yes, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1     THE COURT:  Do you understand also, on the other

2  hand, by pleading guilty, you give up the right to testify

3  before the jury in your own defense if you should choose to

4  do so or to offer witnesses or evidence that you think might

5  be exculpatory or mitigating?

6     THE DEFENDANT:  I understand that, yes.

7     THE COURT:  Do you understand that you give up the

8  right to confront the witnesses against you?  That's a

9  lawyer's term of art for cross-examination, that is, to have

10  your lawyer, Ms. Fried, question the government's witnesses.

11     THE DEFENDANT:  Yes, I do.

12     THE COURT:  And do you understand that you give up

13  the right to remain silent, at least for purposes of today's

14  proceedings?

15     THE DEFENDANT:  Yes, your Honor.

16     THE COURT:  Let me ask Mr. Shine to summarize for

17  us the evidence he would present if the case did go to trial

18  before a jury, and, when he finishes, I have to then ask you

19  if you are taking responsibility, that is, if you agree,

20  that you are responsible for the important aspects of the

21  government's proof, those aspects that go to the elements of

22  the offense.

23     MR. SHINE:  Your Honor, should this case go to

24  trial, the government's evidence would prove the following:

25     On January 9, 2009, at approximately 1:07 in the

PDF created with pdfFactory trial version www.pdffactory.com

1    afternoon, the Cambridge Trust Company, located at 1720

2    Mass. Ave. in Cambridge was robbed.

3         The bank surveillance photographs show that the robber

4    was wearing a dark, hooded blue sweatshirt over his head,

5    blue jeans, black shoes and a mask over his nose and face.

6         Following the robbery, tellers were interviewed by the

7    FBI's Violent Crime Task Force.

8         The tellers would indicate that this individual walked

9    into the bank, climbed over the counter and stated to the

10   tellers, Open your drawer, Open your bottom drawer.

11        He took money out of a female teller's drawer and

12   afterwards went to the desk and took money from another

13   drawer.  When he took that money, he took with it bait money

14   and a red dye pack.

15        After climbing over the teller's counter, he fled the

16   bank in an unknown direction.  The victim tellers described

17   the robber as a white male, 5 foot 11, slender, wearing a

18   black hooded sweatshirt, sun glasses, blue jeans and white

19   gloves.

20        A post-robbery audit was conducted by the bank, and it

21   determined that the loss amount was $14,775.

22        On January 15, a few days later, the FBI received a tip

23   from the Milford Police Department that an individual by the

24   name of David Laperle, of Waterbury, Connecticut, had

25   checked into La Quinta Hotel in Milford, and at that time

1    the individual had used red dye-stained money to pay for the

2    hotel room, and were basically calling to find out, you

3    know, is there anybody you're looking for that might have

4    used red dye-stained money?

5        On January 16, the FBI, with local authorities, set up

6    a surveillance team at the hotel, and they observed an

7    individual later identified as Mr. Laperle exiting and going

8    into a red or dark-colored Dodge Caravan minivan.

9        He put his bags in the car, at which point the car was

10   stopped.

11       He was taken from the car and given his Miranda

12   warnings.

13       On his person, Mr. Laperle had $590 in red-stained U.S.

14   currency.  They searched the car.  They found no weapons,

15   but they found a brown paper back containing $7,345 in

16   red-stained currency.

17       The vehicle was damaged, the ignition, and the vehicle

18   was towed.

19       They searched the vehicle and they found a number of

20   different items, including clothing, additional money, all

21   of which matched up to the individual that was wearing that

22   clothing participated and probably robbed the bank at the

23   time.

24       And, just for purposes of the record, the bank, the

25   Cambridge Trust Company, was, on the date of the robbery, a

PDF created with pdfFactory trial version www.pdffactory.com

1    federally insured deposit bank with the U.S. Government.

2             THE COURT:  So there's no allegation of a weapon?

3             MR. SHINE:  Absolutely no allegation of a weapon.

4        The individual jumped over the counter, opened the

5    drawers, made some comments or statements to the tellers who

6    were placed in fear.  Money was taken.  He then took the

7    money out, left the bank and fled the area.

8             THE COURT:  All right, Mr. Laperle, is that true,

9    as the government has explained it to me?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  How did Connecticut get into this?  Had

12   you moved to Connecticut in the meantime?

13            THE DEFENDANT:  It was just an address that I gave

14   to --

15            THE COURT:  Oh, to check into the motel?

16            THE DEFENDANT:  Yes, your Honor.

17            THE COURT:  Are you pleading guilty willfully,

18   freely, and voluntarily?

19            THE DEFENDANT:  Yes, I am.

20            THE COURT:  Has anyone coerced you in a physical

21   sense into pleading guilty?

22            THE DEFENDANT:  No, your Honor.

23            THE COURT:  Have any promises, other than the one

24   we've discussed about the credit for the state time, been

25   made to induce you to plead guilty?

```
 1              THE DEFENDANT:  No, your Honor.

 2              THE COURT:  Have any threats been made, other than,

 3     obviously, the threat of being prosecuted?

 4              THE DEFENDANT:  No, your Honor.

 5              THE COURT:  Have you had sufficient time to discuss

 6     with Ms. Fried the charge in the case, your rights, your

 7     possible defenses, and the consequences of pleading guilty?

 8              THE DEFENDANT:  Yes, I have, your Honor.

 9              THE COURT:  Do you believe she's acted at all times

10     in your best interest?

11              THE DEFENDANT:  Yes, I do.

12              THE COURT:  Ms. Fried, it's your recommendation

13     that I accept the plea?

14              MS. FRIED:  Yes, it is, your Honor.

15              THE COURT:  Mr. Laperle, have I confused you by

16     anything I said or any question I asked?

17              THE DEFENDANT:  Not at all, your Honor.

18              THE COURT:  So I am correct you're pleading guilty

19     because you are guilty and, given the circumstances, you

20     think that this -- well, "deal" I will call it, is the best

21     thing in your own interest?

22              THE DEFENDANT:  Yes, your Honor.

23              THE COURT:  Do counsel have anything else you would

24     like me to inquire into?

25              MR. SHINE:  The government has nothing else.  Thank
```

```
 1    you.

 2              MS. FRIED:  No.  Nothing else from the defense.

 3              THE COURT:  All right, Mr. Laperle, would you step

 4    then back to counsel table with Ms. Fried.

 5         (Pause in proceedings.)

 6              THE COURT:  All right.  I find that Mr. Laperle is

 7    well-oriented, that his answers have been fully responsive

 8    to my questions.

 9         I find that he understands the nature of the charge and

10    the potential penalties that he faces.

11         I find he is certainly competent to enter a plea, and

12    that he has done so with the full understanding of his

13    rights and the consequences of waiving those rights.

14         I find there is a sufficient -- indeed, an overwhelming

15    basis in the facts presented by the government to warrant a

16    finding of guilt on the offense beyond a reasonable doubt.

17         In sum, I find that the plea is tendered voluntarily,

18    with full knowledge of its consequences, and after careful

19    consideration by the defendant of his own best interest.

20         I will accept the plea, and I will schedule sentencing

21    for Thursday, May 12, 2011, at 2 p.m.

22              MR. SHINE:  That's an acceptable date for the

23    government, your Honor.

24              MS. FRIED:  That's fine.

25              THE COURT:  Okay.
```

PDF created with pdfFactory trial version www.pdffactory.com

1      All right, Mr. Laperle, I will see you then in May, and

2   by then we should have the benefit of further guidance from

3   the First Circuit.

4           THE DEFENDANT:  Thank you, your Honor.

5           MS. FRIED:  Your Honor, if by chance, Dancy has not

6   been decided by then, would the Court entertain a motion?

7           THE COURT:  Of course.  I would rather get it right

8   the first time --

9           MR. SHINE:  Absolutely.

10          THE COURT:  -- than the way I usually do it.

11      (Laughter.)

12          MR. SHINE:  Thank you very much, your Honor.

13          THE CLERK:  All rise.

14      Court is in recess.

15      (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

    I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons           November 8, 2011

_____
James P. Gibbons


              JAMES P. GIBBONS, CSR, RPR, RMR
                 Official Court Reporter
             1 Courthouse Way, Suite 7205
              Boston, Massachusetts 02210
                jmsgibbons@yahoo.com

PDF created with pdfFactory trial version www.pdffactory.com